700 P.2d 134

**Jack PICKERING, Plaintiff-Appellant,**

v.

**EL JAY EQUIPMENT COMPANY, INC., a corporation; Cecil Lofthouse, Merle Lofthouse, and Val J. Lofthouse, directors, Defendants-Respondents.**

**No. 13956.**

Court of Appeals of Idaho.

May 1, 1985.

Royce B. Lee of Ririe, Lee, Jenkins & Hall, Idaho Falls, for plaintiff-appellant.

Brent J. Moss, Val Dean Dalling, Jr., of Smith, Hancock & Moss, Rexburg, for defendants-respondents.

SWANSTROM, Judge.

Jack Pickering brought this suit against his former employer El Jay Equipment Company and Cecil, Merle and Val Lofthouse to recover on a promissory note and to recover back wages. El Jay counterclaimed, seeking an accounting for breach of fiduciary duty. The district court held that the note was not supported by consideration and was thus unenforceable. On El Jay's counterclaim, the court held that Pickering had indeed breached his fiduciary duty to the corporation and awarded damages against him. The court offset those damages by amounts owed for back wages. Pickering has appealed, contending that the trial court erred in denying him any recovery on the promissory note and that it erred in its accounting of the transactions involving Pickering and El Jay. We affirm in part, reverse in part and remand.

Pickering has raised several issues on appeal. First, he argues that a loan to a corporation constitutes adequate consideration for a note executed by the corporation to the lender. Second, he argues that retention by the corporation of the benefits of his actions constitutes a ratification of those actions. Third, Pickering maintains that the district court erred in basing the damages for breach of fiduciary duty on gross profits rather than on net profits. Fourth, he objects to the award of attorney fees to the defendants pursuant to I.C. § 12–121. Finally, Pickering requests attorney fees on appeal.

## FACTS

At all times relevant to this case, Pickering owned one-third of the stock in El Jay. He was employed by the corporation as a farm equipment salesman. He was also a director of the corporation and its secretary. The only other stockholder, a man named Hopkins, was the corporation's president and sole manager. In May 1976, Hopkins was severely injured in an accident. Unable to work, Hopkins told Pickering to do the best he could to manage the business.

Shortly before Hopkins was injured, Pickering and Hopkins agreed to buy a tractor and a combine from a Mr. Winterfield. The purchase price for the tractor was $7,500. The parties agreed that Winterfield would be paid when the tractor was resold. Pickering eventually sold the tractor to Mr. Wright for $10,000. Of this amount, Wright was supposed to pay $3,000 in cash,[1] while the remaining $7,000

---

1. Wright ultimately paid Pickering $1,500 of the

"down payment" and Pickering testified that he

was to be financed by the Allis-Chalmers Credit Corporation (ACCC). In July 1976, El Jay received a $7,000 check from ACCC which should have resulted in an immediate payment of $7,500 to Winterfield.

Pickering testified that El Jay was having cash-flow problems at this time due to a rapid growth in its business. This testimony did not stand uncontradicted. There is, however, no question that El Jay retained and used the $7,000 received from Allis-Chalmers. Pickering explained he was concerned that El Jay would not be able to meet its operating expenses, so he instructed El Jay's bookkeeper to keep the $7,000 check for the corporation's use rather than send it to Winterfield. Pickering expected that the corporation would be able to pay Winterfield within a short time but he resolved he would personally see to it that Winterfield was paid. He also executed a $7,000 promissory note, in his capacity as secretary of El Jay, payable to himself, as an individual. Pickering testified he did this to assure he would be able to obtain funds from the corporation to meet the obligation he personally had made to Winterfield. The note provided for a ten-percent interest rate and a maturity date of December 15, 1976. Pickering eventually did pay Winterfield $7,500 using proceeds from a loan he obtained and funds earned in a series of private transactions involving farm machinery. These were the transactions the district court found to be in violation of Pickering's fiduciary duty not to compete with a corporation of which he was a director and officer. That Pickering breached his fiduciary duty is not contested on appeal; rather, he questions the proper measure of damages for such a breach.

Near the end of July 1976, the Lofthouses bought out Hopkins' interest in El Jay and shortly thereafter discovered that Pickering was dealing on the side. Cecil Lofthouse asked him to stop. Pickering complied, but only after completing several

transactions which were then in progress. In December, Pickering's employment with El Jay was terminated and the Lofthouses eventually decided to liquidate the assets of the corporation. Pickering then filed suit against El Jay and its new stockholders to collect his unpaid salary and the promissory note.

## PROMISSORY NOTE

The first issue we will discuss is whether the El Jay promissory note to Pickering was supported by consideration and was thus enforceable. Pickering argues that it was, urging us to overturn the district court's finding. El Jay, on the other hand, maintains there was no consideration for the note because (1) the parties did not bargain over the consideration, (2) El Jay did not receive any benefit from Pickering's actions, and (3) Pickering did not assume the obligation to Winterfield at El Jay's request. The district court simply found that no consideration was given.

Although no finding was made by the district court, it is undisputed that El Jay made the deal to take the Winterfield tractor, resell it and pay Winterfield $7,500 when the tractor was sold. After Hopkins was injured Pickering did resell the tractor to Wright as we have mentioned. The sale to Wright for $10,000 was handled as if El Jay owned the tractor. This enabled Wright to finance $7,000 of the purchase price through ACCC because El Jay, as an Allis-Chalmers dealer, stood behind the transaction. However, as we have also mentioned, El Jay received only $7,000 from the sale. Pickering received $1,500 from Wright and Wright never paid the remaining $1,500 to anybody.

Pickering, as acting manager of El Jay when the $7,000 was received from ACCC, made the decision to delay paying the money over to Winterfield, although it was obviously then due. He stated that he personally assumed the obligation to pay the $7,000 owing to Winterfield by El Jay.

never collected the remaining $1,500 because Wright "lost his health" and has not "got any-

thing."

By doing so, he argues, El Jay was "released" from its responsibility to Winterfield. In Pickering's view, this benefit to the corporation of a "loan" of his own funds constitutes the consideration for the promissory note for $7,000 that he executed on behalf of El Jay, payable to himself. In fact, and to his credit, Pickering did eventually pay the $7,500 due to Winterfield. He testified part of the funds came from other transactions and part he borrowed. In its memorandum decision, the district court stated: "The Court cannot find any consideration for the note, it being obvious that the corporation did not owe Pickering $7,000." The court further stated that Pickering's promise that Winterfield would be paid "did not create a corporate debt."

■ We agree that when Pickering took the promissory note from El Jay he gave El Jay no consideration for it. First, his decision, as an officer of El Jay corporation, not to pay over the $7,000 received from ACCC to Winterfield was wrongful. It violated an agreement that El Jay, as well as Pickering, had made with Winterfield. Although Pickering may have then made a personal commitment that Winterfield would be paid, this commitment did not then release El Jay from its debt to Winterfield. If the debt was El Jay's, the "promise" of Pickering to pay the debt himself was unenforceable. If the debt to Winterfield was one on which Pickering was already obligated, he gave up nothing by "promising" to pay it. We hold that the judge's ruling in regard to a lack of consideration was correct.

As a further defense to the promissory note, respondents contend that Pickering was not authorized to execute the promissory note in behalf of El Jay corporation. The district judge made no findings on the issue, and, because of our holding in regard to lack of consideration, we do not need to address it.

■ On the other hand, Pickering argues that even if the note was initially invalid, the corporation nevertheless ratified the giving of the note by an acceptance and retention of its benefit. We are not persuaded. There was no evidence that Pickering made any other officer, shareholder or director aware of the promissory note before this suit was filed. We are not persuaded that he could, on behalf of the corporation, ratify his own acts. *See Alward v. Broadway Gold Mining Co.*, 94 Mont. 45, 20 P.2d 647 (1933).

We hold that the district court was correct in ruling that Pickering could not enforce the promissory note. However, by so holding we do not preclude Pickering from recovering, through an offset, the $7,000 El Jay received in the Winterfield transaction through Pickering's efforts. We will discuss that later in this opinion.

## DAMAGES

The second issue we will address concerns the measure of damages for Pickering's breach of fiduciary duty in entering into the various side transactions. Pickering, while he admits to the breach of fiduciary duty, argues that the measure of damages should be based upon net profits. In other words, in computing the damages, Pickering would deduct certain losses and expenses incurred in performing those transactions. El Jay and the Lofthouses, on the other hand, maintain that the district court was correct in disallowing the expenses and some of the losses incurred by Pickering. They go further, however, and insist that the district court improperly allowed an offset for a loss incurred in one of the transactions.

The court found that Pickering bought and sold several pieces of equipment in a series of related transactions summarized as follows:

| | | |
|---|---|---|
| (1) Winterfield tractor sale price | $ 10,000 | |
| Pickering's cost | − 7,500 | |
| Profit realized | | $ 2,500 |
| (2) Profit realized from sale of combine | | $ 6,000 |
| (3) JD 4400 combine sale price | $ 8,500 | |
| 300 MF combine traded in, valued at | 5,000 | |
| Roller traded in, valued at | 1,000 | |
| Pickering's cost | −16,000 | |
| Loss calculated by court | | ($ 1,500) |
| (4) Sale of 300 MF combine from (3) | $ 5,000 | |
| JD 45 combine traded in, valued at | 2,500 | |
| Pickering's cost | − 5,000 | |
| Profit calculated by court | | $ 2,500 |

| (5) | [Profit realized on sale of | | $ 4,200 |
| (6) | three AC combines in | | -0- |
| (7) | separate transactions] | | 5,025 |
| (8) | Gleaner combine sale price | $ 2,500 | |
| | Pickering's cost | − 2,000 | |
| | Commission paid | − 200 | |
| | Profit calculated by court | | 300 |
| | Total profit charged to Pickering | | $19,025 |

Only four transactions in the accounting are disputed on appeal. Those are numbered 1, 3, 4, and 8. Pickering contends that $1,500 was not collected in the first transaction and was furthermore uncollectible. Thus, instead of showing a profit of $2,500, as the district court found, Pickering argues that the profit should only be $1,000. In the third transaction Pickering contends that a trade roller, valued at $1,000 and allowed as part of the sale price, was never delivered to Pickering and has since disappeared. Thus, he argues, the sale price was actually $1,000 less than shown on the district court's accounting and the loss should have been $2,500 instead of $1,500. In the fourth transaction Pickering maintains that there was no profit at all on the 300 MF combine transaction because a John Deere 45 combine, allowed as part of the sale price, was valueless. Finally, various items of expenses are claimed by Pickering to be legitimate offsets against the profits he obtained as a result of transactions. Among these expenses are commissions paid to another salesman, repair bills and interest paid on a loan obtained to satisfy the $7,500 obligation to Winterfield. The district court apparently allowed one $200 commission to be offset, but rejected the other proposed offsets.

■ The measure of damages in an action for breach of fiduciary duty is the same as the measure of damages in an action for breach of trust. *See Hudson v. American Founders Life Insurance Company of Denver*, 151 Colo. 54, 377 P.2d 391 (1963). "If the trustee commits a breach of trust, he is chargeable with any profit which would have accrued to the trust estate if he had not committed such breach of trust." RESTATEMENT (SECOND) OF TRUSTS § 205 comment i (1959) (herein-

after referred to as "Restatement"). On the other hand, "if the trustee commits a breach of trust and if a loss is incurred, the trustee may not be chargeable with the amount of the loss if it would have occurred in the absence of a breach of trust." Restatement § 205 comment f. Thus, the question is whether El Jay, in a properly conducted transaction, would have received the $1,500 deemed uncollectible by Pickering in the Winterfield tractor transaction and the $1,000 trade roller in the third transaction. If the corporation would indeed have received the cash and the roller, Pickering would be charged for these amounts even though he did not actually receive them. This is a question the trier of fact must answer and which the district court in this case did not. Therefore, on remand the district court is instructed to make findings on these questions.

■ Respondents have contended on appeal that the district court erred in offsetting the loss realized in the third transaction against the gains realized in other transactions. Respondents, however, filed no cross-appeal on this issue. Moreover, it is clear from the evidence that transactions two, three and four were related. Equipment taken in trade on one transaction was involved in the next. In such circumstances it is proper to allow offsets. *Matter of Estate of Bartlett*, 680 P.2d 369 (Okla. 1984); 3 A. SCOTT, LAW OF TRUSTS § 213 (3d ed.1967).

■ One thing is clear in respect to the first transaction involving the purchase and resale of the Winterfield tractor. The district court charged Pickering as if he had received the $10,000 sale price. In fact, El Jay received and retained $7,000 financed through ACCC. As we have mentioned, Pickering received only $1,500 of the "down payment" and deemed the remaining $1,500 uncollectible. Pickering is entitled to a $7,000 offset against the amount which the district court found due from Pickering to El Jay because of these eight transactions.

We next decide whether Pickering should be charged in the fourth transaction with the $2,500 value assigned to the John Deere 45 combine which he now claims is valueless. Pickering, in essence, bought the combine for $2,500 because he assigned that value to it as a trade-in. A trustee is guilty of a breach of trust if he knowingly pays more than he should have paid for an item, and he is chargeable with the difference between what he paid and the market value of the item. Restatement § 205 comment e. At trial, Pickering testified the combine was worthless. He also admitted during cross-examination that he took it merely as "an accommodation to the man that bought" the 300 MF combine. Thus, even though assigned a value of $2,500, it is apparent that the John Deere 45 combine had no value at the time of the trade. Pickering, therefore, paid $2,500 for a combine which was worth nothing. He is chargeable with the difference between what he paid and what the item was worth, or $2,500. The district court did not err in allocating a $2,500 profit for the fourth transaction.

In the eighth transaction the district court erroneously listed the sale price of the Gleaner tractor to be $2,500. Respondents admit the sale price was $2,000. The district court should make this correction in its calculations. Respondents argue the court also erred in allowing Pickering a $200 credit for a commission he paid to another El Jay salesman, Scott Bunta, in this transaction. However, we note there is evidence in the record to support the allowance. Pickering's testimony indicated that had Bunta made the sale for El Jay, instead of for Pickering, the corporation would have incurred this commission. Respondents, on the other hand, have not shown that the $200 allowance was erroneous. Pickering also testified to having paid another commission to Bunta on another transaction. The district court did not allow this commission. On remand the district court should make findings in support of either allowing or disallowing the additional commission.

Finally, Pickering maintains that various expenses he incurred during these separate transactions should be offset against the profit with which he was charged. We disagree. If a trustee breaches his duty of loyalty to the beneficiary by entering into competition with the beneficiary, the beneficiary can compel the trustee to account for any profit made. The beneficiary, however, can only compel the trustee to account if the trustee is reimbursed for his expenses. Restatement § 206 comment 1, illustration 12. The question becomes: what expenses are properly chargeable to a trust estate? The Restatement offers no specific guidance; but we believe that only those expenses a prudent and properly acting trustee would have incurred in making the same transaction should be allowed as an offset. To allow more would be to punish the innocent beneficiary and, at the same time, make the trustee, who was guilty of a breach of trust, whole. This we will not do. Here Pickering did not show that a prudent trustee would have incurred certain expenses for repairs and the delivery of equipment, as he now claims. Indeed, had Pickering not been dealing on the side the corporation would have performed these repairs and the delivery itself. We conclude that Pickering has not shown that the court erred in disallowing these expenses.

Pickering also challenges the district court's award of attorney fees at trial. He insists that the award must be reversed because the court made no findings as required by I.R.C.P. 54(e)(1). Because this action was filed prior to the effective date of that rule, however, the court was free to award attorney fees to the prevailing party in its discretion. See Ladd v. Coats, 105 Idaho 250, 668 P.2d 126 (Ct.App.1983). We emphasize that the critical date is the time the action is filed, not the time of trial as Pickering suggested in his brief. However, because we are remanding for additional findings, we vacate the award of attorney fees. When new findings are entered, the district court may again exercise its discretion, if it so chooses, to award

attorney fees to the prevailing party. Pickering's request for attorney fees on appeal is denied because we do not believe El Jay defended this appeal frivolously, unreasonably, or without foundation. *See Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 591 P.2d 1078 (1979).

The judgment of the district court is reversed and the cause is remanded for further proceedings consistent with this opinion. Costs to appellant.

WALTERS, C.J., and BURNETT, J., concur.